1

2

3

4

5

6

7                           O

                    UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

JOSE JUAN RIVERA,            ) Case No. CV 12-5759-JPR
                             )
                Plaintiff,   )
                             )
        vs.                  ) MEMORANDUM OPINION AND ORDER
                             ) AFFIRMING THE COMMISSIONER
                             )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social       )
Security,[1]                 )
                             )
                Defendant.   )
                             )
_____)

I.   PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB") and Social Security Supplemental Security Income
benefits ("SSI").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  This matter is before the Court on the parties' Joint
Stipulation, filed April 9, 2013, which the Court has taken under

_____

        [1]   On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on November 29, 1953. (Administrative Record ("AR") 88-89, 209, 214.)  He attended some high school but did not complete 10th grade.  (AR 19.)  For 24 years Plaintiff worked for a termite-control company, where he treated buildings for termites and repaired wood damage.  (AR 22-23, 266-67.) Plaintiff was injured at work on June 24, 2004, and reinjured on May 5, 2005.  (AR 24-25, 43.)  He stopped working on May 7, 2005. (AR 265.)

On June 27, 2006, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of May 7, 2005.  (AR 88-89, 93-94, 209-18.)  After Plaintiff's applications were denied, he requested a hearing before an Administrative Law Judge ("ALJ"). (AR 164-65.)  A hearing was held on May 12, 2008, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (AR 16-56.)  On November 4, 2008, the ALJ issued a written decision finding Plaintiff not disabled. (AR 98-107.)  On November 7, 2008, Plaintiff requested review of the ALJ's decision.  (AR 168.)  On July 7, 2009, the Appeals Council granted review, vacated the ALJ's decision, and remanded the case for further proceedings, instructing the ALJ to address a report from Plaintiff's chiropractor, give further consideration to Plaintiff's RFC, and, if necessary, solicit new VE testimony.  (AR 109-10.)

A second hearing was held before the same ALJ on January 6,

2

2011, at which Plaintiff, who was represented by counsel, and a VE testified.  (AR 57-87.)  On March 15, 2011, the ALJ issued a written decision finding Plaintiff not disabled.[2]  (AR 114-29.) On March 23, 2011, Plaintiff requested review of that decision. (AR 15.)  On May 10, 2012, the Appeals Council denied his request for review.  (AR 1-5.)  This action followed.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming

_____

[2]    In both decisions, the ALJ stated that Plaintiff applied for DIB but neglected to state that he also applied for SSI.  (AR 98, 114.)

1  or reversing," the reviewing court "may not substitute its

2  judgment" for that of the Commissioner.   Id. at 720-21.

3  **IV.   THE EVALUATION OF DISABILITY**

4       People are "disabled" for purposes of receiving Social

5  Security benefits if they are unable to engage in any substantial

6  gainful activity owing to a physical or mental impairment that is

7  expected to result in death or which has lasted, or is expected

8  to last, for a continuous period of at least 12 months.   42

9  U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

10 (9th Cir. 1992).

11       A.   The Five-Step Evaluation Process

12       The ALJ follows a five-step sequential evaluation process in

13 assessing whether a claimant is disabled.   20 C.F.R.

14 §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

15 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first

16 step, the Commissioner must determine whether the claimant is

17 currently engaged in substantial gainful activity; if so, the

18 claimant is not disabled and the claim must be denied.

19 §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   If the claimant is not

20 engaged in substantial gainful activity, the second step requires

21 the Commissioner to determine whether the claimant has a "severe"

22 impairment or combination of impairments significantly limiting

23 his ability to do basic work activities; if not, a finding of not

24 disabled is made and the claim must be denied.

25 §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   If the claimant has a

26 "severe" impairment or combination of impairments, the third step

27 requires the Commissioner to determine whether the impairment or

28 combination of impairments meets or equals an impairment in the

Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
404, Subpart P, Appendix 1; if so, disability is conclusively
presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).  If the claimant's impairment or combination
of impairments does not meet or equal an impairment in the
Listing, the fourth step requires the Commissioner to determine
whether the claimant has sufficient residual functional capacity
("RFC")[3] to perform his past work; if so, the claimant is not
disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv).  The claimant has the burden of proving that
he is unable to perform past relevant work.  <u>Drouin</u>, 966 F.2d at
1257.  If the claimant meets that burden, a prima facie case of
disability is established.  <u>Id.</u>  If that happens or if the
claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because he can perform other substantial gainful work available
in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at
828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

 B. <u>The ALJ's Application of the Five-Step Process</u>

 At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since May 7, 2005.  (AR 117.)  At
step two, the ALJ concluded that Plaintiff had the severe

---

  [3] RFC is what a claimant can do despite existing
exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545,
416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th
Cir. 1989).

5

impairments of degenerative changes of the right knee; "residuals (post-traumatic changes of the left foot and swelling and loss of eversion) of ancient fracture of the left calcaneal";[4] "residuals of torn menisci of the left knee (status post arthroscopy, meniscectomies, and chondroplasty on September 21, 2005)"; "supraspinatus tendinosis (with small partial tear), superior labrum from anterior to posterior (SLAP) tear, and acromioclavicular osteoarthrosis of the right shoulder";[5] "supraspinatus tendinosis, SLAP tear, and acromioclavicular osteoarthrosis of the left shoulder"; degenerative changes of the cervical and thoracic spine; "levoscoliosis and degenerative disc disease of the lumbosacral spine with lumbarization of S1"; hypertension; depressive disorder; anxiety disorder; and alcohol abuse. (Id. (internal citations omitted).) At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 118.) At step four, the ALJ found that Plaintiff had the RFC to "lift and carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for six out of eight hours," "sit for six hours in an eight-hour workday," and "frequently, but not constantly, reach in all

---

[4]    Eversion is "the condition (as of the foot) of being turned or rotated outward." Eversion, Merriam-Webster, http://www.merriam-webster.com/dictionary/eversion (last accessed Aug. 19, 2013).

[5]    As the ALJ noted, "SLAP" stands for "superior labrum, anterior to posterior." Shoulder SLAP Tear - Topic Overview, WebMD, http://www.webmd.com/pain-management/tc/shoulder-slap-tear-topic-overview (last updated Jul. 6, 2011). The labrum is a ring of firm tissue around the shoulder socket, and a SLAP tear results when it frays or tears as the result of an injury. Id.

directions." (AR 119.)  The ALJ found that Plaintiff had "no work-related mental limitations." (<u>Id.</u>)  Based on the VE's testimony at the May 2008 hearing, the ALJ concluded that Plaintiff was unable to perform his past relevant work but could perform jobs that existed in significant numbers in the national economy. (AR 127-29.)  Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 129.)

**V.   RELEVANT FACTS**

On June 24, 2004, Plaintiff fell and injured his ribs and back while working in a customer's attic. (AR 521.)  Doctors at Kaiser Permanente diagnosed multiple left-side rib fractures and lumbar strain and told him to remain off work. (AR 511-32, 543-46, 564.)

On September 10, 2004, Dr. Alexander Miric at Kaiser Permanente noted that Plaintiff reported having left-knee pain "from time to time." (AR 541.)  Dr. Miric noted that Plaintiff's knee had no effusion and "no areas of point tenderness except for the medial patellar facet," and x-rays showed "mild, if any, arthritic changes." (<u>Id.</u>)  Dr. Miric prescribed physical therapy and medication. (<u>Id.</u>)  On September 14, 2004, an x-ray of Plaintiff's right knee showed "mild degenerative or arthritic changes." (AR 563.)

On September 21, 2004, Dr. Jimmie S. Kung at Kaiser Permanente noted that Plaintiff still complained of low-back pain, which was aggravated by prolonged sitting, and pain in the left rib cage. (AR 516.)  Dr. Kung recommended that Plaintiff return to modified work, with no bending, twisting, lifting over 15 pounds, or pushing or pulling with the left hand. (<u>Id.</u>)  On

October 21, 2004, Dr. Kung noted that Plaintiff felt better and
had returned to work.  (AR 514.)  He recommended that Plaintiff
return to modified work, with no lifting over 40 pounds.  (AR
513.)  On December 10, 2004, Dr. Kung found that Plaintiff had
"minimal pain and occasional tenderness over the lateral aspect
of the flank area," "good strength," and "no neurological
deficit," and he noted that Plaintiff had returned to his regular
work duties "without difficulty."  (AR 512.)  Dr. Kung discharged
Plaintiff as "cure[d]" with "no permanent disability."  (Id.)

On May 5, 2005, Dr. John C. Norton noted that Plaintiff had
fallen in an attic while working and suffered a rib fracture and
injuries to his upper and lower back and left hip.[6]  (AR 352-53.)
Plaintiff complained of persistent thoracic-spine and left-hip
pain and reported that he had been working but was "having
difficulty carrying heavy loads and performing his job
activities," which included "heavy labor" and "crawl[ing] under
buildings."  (AR 353.)  Dr. Norton diagnosed chronic low-back
strain, chronic left-hip strain, status-post-left-ninth-rib
fracture, and left-hip trochanteric bursitis.  (Id.)  He opined
that from May 5 to June 3, 2005, Plaintiff could return to
modified work, with no bending, climbing, or lifting more than
five pounds.  (AR 352.)

On May 7, 2005, chiropractor Harry J. Wurmsdobler completed

_____

[6]    Although Dr. Norton did not mention it, Plaintiff later
reported to examining physician Seymour L. Alban that on May 5,
2007 — the same day Plaintiff saw Dr. Norton — he had twisted his
body while on an extension ladder at work and "felt greater pain
in the low back radiating to both buttock and left hip and leg,
left knee, heel and ankle."  (AR 401.)  At the hearing, Plaintiff
affirmed that his report to Dr. Alban was correct.  (AR 43-44.)

8

1  a report of Plaintiff's occupational injury.  (AR 483.)  Dr.
2  Wurmsdobler found that Plaintiff had restricted range of motion
3  of the left knee, a positive straight-leg-raising test, and
4  restricted lumbar range of motion, among other things.  (Id.)

5       On July 7, 2005, Dr. Jacob E. Tauber, an orthopedic surgeon,
6  examined Plaintiff and completed reports as part of his worker's
7  compensation case.  (AR 354-60.)  Dr. Tauber noted that Plaintiff
8  walked with a left-lower-extremity limp and had pain when moving
9  his shoulders, positive impingement signs in both shoulders, and
10 left-knee tenderness and slight crepitation.  (AR 354.)  Dr.
11 Tauber found that Plaintiff was "neurologically intact for motor
12 strength, deep tendon reflexes and sensation to pinprick."  (AR
13 355.)  X-rays of Plaintiff's left foot and ankle revealed a
14 healed calcaneus fracture, and x-rays of his shoulders showed
15 acromioclavicular arthritis and downsloping of the acromion.
16 (Id.)  Plaintiff's "thoracic and lumbar spine films" and "[k]nee
17 films" were "negative."  (Id.)  Dr. Tauber diagnosed chronic
18 thoracolumbar sprain and possible disc abnormality, left-knee
19 impingement, bilateral shoulder-impingement syndrome, and healed
20 left-calcaneus fracture with posttraumatic subtalar arthritis.
21 (Id.)  He prescribed medication, ordered MRIs, and opined that
22 Plaintiff was temporarily totally disabled.  (Id.)

23      Also on July 7, 2005, an MRI of Plaintiff's lumbar spine
24 revealed "transitional lumbosacral spine anatomy with
25 lumbarization of S1," "mild levoscoliosis with mild-moderate
26 degenerative disc change at L3-4 and L4-5," and "minimal bulge of
27 the annulus without significant disc protrusion at inferior
28 levels and mild-moderate facet arthropathy" resulting in "mild

foraminal stenosis at inferior levels without mass effect on existing nerve roots." (AR 436.) An MRI of Plaintiff's thoracic spine showed "minimal degenerative disc changes and mild facet arthropathy at inferior levels" that were "within normal limits for age"; no other significant abnormalities existed. (AR 495.) An MRI of Plaintiff's left knee showed "a complex tear of the posterior horn of the medial meniscus with associated meniscal cyst." (AR 497.)

On July 11, 2005, an MRI of Plaintiff's right shoulder showed a "SLAP tear probably extending into the biceps origin," "paralabral cyst," "supraspinatus tendinosis and a small partial tear," "acromioclavicular degenerative disease," and "probable partial tear of the subscapularis insertion." (AR 438.) An MRI of Plaintiff's left shoulder showed a "SLAP tear probably extending into the biceps origin," possible "partial tear of the subscapularis insertion," "acromioclavicular degenerative disease," and "supraspinatus tendinosis without a definite tear." (AR 440.)

On August 4, 2005, Dr. Tauber noted that Plaintiff's MRIs revealed "multiple abnormalities," including a "significant complex tear of the medial meniscus." (AR 362.) Upon examination, Dr. Tauber found that Plaintiff had "exquisite medial jointline tenderness at his knee." (Id.) Dr. Tauber noted that Plaintiff wanted to undergo left-knee surgery and was temporarily totally disabled until September 8, 2005. (AR 362-63, 753.)

On September 8, 2005, Dr. Tauber noted that Plaintiff had "continuing complaints," found that Plaintiff's physical

10

examination was "unchanged," and opined that Plaintiff would be temporarily totally disabled until October 6, 2005. (AR 747, 749.) On September 21, 2005, Plaintiff underwent left-knee surgery. (AR 374-75.) On September 29, 2005, Dr. Tauber noted that Plaintiff was to undergo "knee rehabilitation" and would remain temporarily totally disabled until November 3, 2005. (AR 376, 744.)

On October 31, 2005, Dr. Gary A. Rosenberg at Kaiser Permanente performed an orthopedic consultation of Plaintiff's left foot. (AR 561.) Dr. Rosenberg noted that Plaintiff had suffered a calcaneal fracture 25 years earlier and was reporting "increasing pain in the subtalar joint region" but was "still able to work." (Id.) Dr. Rosenberg noted some tenderness and "greatly diminished subtalar range of motion compared to the contralateral side" but concluded that Plaintiff was "not symptomatic enough for a subtalar fusion." (Id.) Dr. Rosenberg noted that if work became "bothersome," Plaintiff "should return to clinic and consideration could be given toward a subtalar fusion." (Id.) Plaintiff apparently never returned for further treatment.

On November 3, 2005, Dr. Tauber noted that Plaintiff had improved after his left-knee surgery and had "excellent motion." (AR 378.) Dr. Tauber recommended physical therapy and opined that Plaintiff was temporarily totally disabled. (Id.) On December 8, 2005, Dr. Tauber noted that Plaintiff complained of "pain, particularly in his back," but said that his knee pain had decreased. (AR 383.) On examination, Dr. Tauber found that Plaintiff had "pain on lumbar motion." (Id.) Dr. Tauber

11

diagnosed facet arthropathy and foraminal stenosis and recommended a "spine rehabilitation program." (Id.) Dr. Tauber opined that Plaintiff was temporarily totally disabled. (Id.)

On January 19, 2006, Dr. Tauber noted that Plaintiff complained of shoulder pain, "intermittent knee pain," and back pain that was "quite severe." (AR 390.) Upon examination, Dr. Tauber noted that Plaintiff was "otherwise unchanged." (Id.) Dr. Tauber recommended a pain-medication program and opined that Plaintiff would be temporarily totally disabled until February 23, 2006. (AR 390, 729.) On January 26, 2006, Dr. Tauber noted that Plaintiff had foraminal stenosis and that his lumbar-spine MRI demonstrated degenerative disc disease and facet arthropathy. (AR 582.) On February 10, 2006, an x-ray of Plaintiff's left foot showed post-traumatic changes; an x-ray of his right foot was normal. (AR 562.)

On February 23, 2006, Dr. Tauber noted that Plaintiff complained of "neck pain with radiation" and "severe" shoulder pain. (AR 394.) Upon examination, Dr. Tauber found that Plaintiff was "otherwise unchanged." (Id.) Dr. Tauber recommended spine rehabilitation and pain management, ordered a cervical-spine MRI, and opined that Plaintiff would be temporarily totally disabled until April 5, 2006. (AR 394-95, 722.)

On March 28, 2006, Dr. Seymour L. Alban, an orthopedic surgeon, completed a medical examination and report as part of

12

Plaintiff's worker's compensation case.[7]  (AR 397-423.)  Dr.
Alban noted that Plaintiff complained of constant low-back pain
with radiation to the buttocks and left hip and leg; constant
right-shoulder pain with radiation to the neck; left-shoulder
pain with radiation to the neck that was present "most of the
time"; constant left-ankle and heel pain; right-ankle and foot
pain that was present when walking; "[p]eriodic" mid-back pain;
left-sided rib-cage pain that was present "once in a while"; and
left-knee pain that was "present slightly when walking."  (AR
398.)  Dr. Alban reviewed Plaintiff's medical file, including
records from Drs. Kung, Norton, and Tauber; the report of
Plaintiff's left-knee surgery; and Plaintiff's knee, spine, and
shoulder MRIs.  (AR 406-11.)

Upon examination, Dr. Alban noted that Plaintiff had "a
normal heel-toe gait" but "limp[ed] on the left side because of
foot and ankle pain."  (AR 411.)  Plaintiff could squat to "only
about 50% of normal."  (Id.)  Dr. Alban noted that Plaintiff had
50 percent of normal cervical flexion; 92 percent of normal
extension; 44 percent of normal left-lateral bending; 27 percent
of normal right-lateral bending; 56 percent of normal left- and
right-cervical rotation; and 42 percent of normal lumbar

---

[7]    Dr. Alban was apparently selected by agreement of both
parties in Plaintiff's worker's compensation case to examine
Plaintiff and render an opinion as to his impairments and
limitations.  (See AR 397 (Dr. Alban's report entitled "agreed
medical examination")); see also Cal. Labor Code § 4062.2 (2012)
(procedure for parties in worker's compensation case to together
select "agreed medical evaluator").

flexion.[8]  (AR 413, 415.)  Dr. Alban noted, however, that
Plaintiff "appeared to give inconsistent and partial effort
during measurement" of his cervical and lumbar ranges of motion.
(AR 412, 415.)  Plaintiff had "2+" reflexes, intact sensation,
and "strong and equal" motor strength throughout.  (AR 418.)  Dr.
Alban reviewed and summarized x-rays of Plaintiff's cervical
spine, shoulders, hands, chest, thoracolumbar spine, lumbar
spine, knees, feet, and ankles.  (AR 419-20.)  He diagnosed
residuals of healed left-lower thoracic-rib fractures; "[l]ower
lumbar spine strain, superimposed on sacralization of L5 and
minor disc pathology"; "[r]esiduals of left knee arthroscopy";
"[r]ight shoulder partial supraspinatus tendinosis and small SLAP
tear, acromioclavicular osteoarthrosis"; "[l]eft shoulder SLAP
tear with possible subscapularis tear and acromioclavucular
osteoarthrosis"; "[r]esiduals of ancient left calcaneal
fracture"; "[t]horacic spine strain with underlying slight
scoliosis and degenerative changes"; minimal cervical
degenerative changes; minimal deformity of the right-fifth-
metacarpal bone; and minimal degenerative changes of the right-
first-metacarpocarpal joint.  (AR 420.)

      Dr. Alban believed that Plaintiff's low-back and thoracic-
spine conditions "reasonably preclude[d] heavy work"; his right-
shoulder condition precluded "prolonged activity or repetitive
over-shoulder motion," "very heavy lifting," and "very heavy
work"; and his thoracolumbar-spine condition precluded him from
"returning to his previous endeavor."  (AR 421-22.)  Dr. Alban

_____

      [8]   Plaintiff's lumbar extension and left- and right-
lateral bending were normal.  (AR 416.)

14

believed that Plaintiff's cervical-spine and right-knee problems did not affect his ability to work. (Id.) Dr. Alban opined that Plaintiff should not perform a job that requires "frequent crawling, kneeling, and the shoulder activity that has led to his difficulties." (AR 421.) Dr. Alban believed that Plaintiff might someday benefit from right-shoulder surgery, but it was "not mandatory" and "would depend on [Plaintiff's] desire for less pain on motion and somewhat greater ability for activity over shoulder level." (AR 422.) He believed that Plaintiff required "periodic medication" for his low back, shoulders, and knee; "periodic application of deep heat, diathermy, ultrasound, or other conservative measures" upon exacerbations of his back or shoulder pain; trigger-point injections; and physical therapy. (Id.)

On April 3, 2006, an MRI of Plaintiff's cervical spine showed "C5-C6 disc/osteophyte complex with mild to moderate spinal stenosis and bilateral foraminal narrowing" and "C6-C7 small central disc protrusion with mild spinal stenosis." (AR 427.) On April 5, 2006, Dr. Tauber noted that Plaintiff's cervical-spine MRI showed stenosis and that he had continuing neck and shoulder pain. (AR 429.) Upon examination, Dr. Tauber noted that Plaintiff had "pain on motion." (Id.) Dr. Tauber opined that Plaintiff was a candidate for shoulder surgery and "extensive further care," including a pain-management program. (AR 429-30.) He opined that Plaintiff was temporarily totally disabled. (AR 430.)

On May 11, 2006, Dr. Tauber noted that Plaintiff continued to complain of pain in his neck, shoulders, left ankle, knee, and

back; his physical examination was "unchanged"; and he remained temporarily totally disabled.  (AR 443.)  On June 15, 2006, Dr. Tauber noted that Plaintiff had "continuing complaints," his physical examination was "unchanged," and he remained temporarily totally disabled.  (AR 574.)  On July 27, 2006, Dr. Tauber noted that Plaintiff complained of knee, shoulder, and back pain; upon examination, he found that Plaintiff had "tenderness at all of these sites."  (AR 707.)  Dr. Tauber opined that Plaintiff was temporarily totally disabled.  (Id.)  On August 31, 2006, Dr. Tauber noted that Plaintiff had "multiple continuing complaints," his physical examination was "unchanged," and he remained temporarily totally disabled.  (AR 654.)

On September 22, 2006, Dr. Herbert E. Johnson, who was board certified in orthopedic surgery, examined Plaintiff at the Social Security Administration's request.  (AR 657-61.)  Dr. Johnson noted that Plaintiff had "slight tenderness" over the right acromioclavicular joint, 100 degrees of abduction in the right shoulder, and 125 degrees of abduction in the left shoulder.  (AR 659.)  Plaintiff had "otherwise full range of motion" and "no findings in the remainder of the upper extremities."  (Id.)  Plaintiff's cervical spine had tenderness but no spasm, full flexion and extension, 45 degrees of right rotation, and 40 degrees of left rotation.  (Id.)  Plaintiff's thoracolumbosacral spine had tenderness but no spasm, 50 degrees of flexion, zero degrees of extension, 10 degrees of lateral bending on the right and five degrees on the left, and "decreased" rotation.  (Id.)  Plaintiff had "slight tenderness" of the left ankle, with zero degrees of eversion.  (Id.)  Plaintiff had full range of motion

of the knees, a negative straight-leg-raising test to 85 degrees bilaterally, a normal gait, "5/5" strength throughout, intact sensation, and normal reflexes.  (AR 659-60.)  Plaintiff was able to move about the office, get on and off the examination table, and perform a partial squat without difficulty.  (AR 659.)

After reviewing some of Plaintiff's medical records (AR 657-58), Dr. Johnson diagnosed Plaintiff with "[s]tatus post multiple rib fractures on the left with no apparent residual"; "[m]ild degenerative joint and disk [sic] disease of the thoracolumbosacral spine, manifested by tenderness without significant spasm and slight decreased range of motion"; "[s]light restrictive pericapsulitis of both shoulders, manifested by decreased range of motion and slight tenderness in the right acromioclavicular joint, possibly consistent with mild degenerative joint disease"; and "[s]tatus post fracture of the left ankle with residual chronic swelling laterally and loss of eversion" (AR 660).

Dr. Johnson opined that Plaintiff could push, pull, lift, and carry 50 pounds occasionally and 25 pounds frequently; stand and walk for six hours in an eight-hour day; sit for an unrestricted amount of time; and frequently bend, kneel, stoop, crawl, crouch, walk on uneven terrain, climb ladders, work at heights, and reach in all directions, including overhead.  (Id.)

On October 12, 2006, Dr. Tauber noted that Plaintiff complained of "significant shoulder pain."  (AR 651.)  Upon examination, Dr. Tauber noted that Plaintiff had "pain on shoulder motion."  (Id.)  Dr. Tauber noted that Plaintiff was a "surgical candidate" but would "continue with conservative

17

measures for the present time" and opined that Plaintiff was temporarily totally disabled.  (Id.)

On October 31, 2006, Dr. B.X. Vaghaiwalla, a nonexamining state-agency consultant, reviewed Plaintiff's medical records and completed a physical-RFC assessment.  (AR 667-71.)  Dr. Vaghaiwalla noted that Plaintiff's primary diagnoses were cervical degenerative joint disease and a shoulder impairment. (AR 667.)  Dr. Vaghaiwalla opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand and walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; perform unlimited pushing and pulling; occasionally climb, balance, stoop, kneel, crouch, and crawl; and frequently reach overhead and across his shoulder.  (AR 668-69.)

On November 16, 2006, Dr. Tauber found that Plaintiff's physical examination was "unchanged," noted that Plaintiff should undergo a pain-management evaluation and was a candidate for surgery, and opined that Plaintiff was temporarily totally disabled.  (AR 686.)

On January 8, 2007, Dr. Tauber examined Plaintiff and found that he had pain on shoulder motion, knee tenderness, and pain throughout his spine.  (AR 684.)  Dr. Tauber recommended that Plaintiff undergo ultrasounds of both shoulders and start a pain-management program.  (Id.)  He opined that Plaintiff was temporarily totally disabled.  (AR 685.)  On April 24, 2007, Plaintiff settled his worker's compensation case.  (AR 869.)

On May 3, 2007, Dr. E.L. Gilpeer, a nonexamining state-agency consultant, reviewed Plaintiff's medical records and completed a physical-RFC assessment.  (AR 778-83.)  Dr. Gilpeer

noted that Plaintiff's diagnoses included cervical and lumbar syndromes, shoulder disorders, and arthralgias. (AR 778.) Dr. Gilpeer reviewed Drs. Johnson's and Tauber's assessments and opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand and walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; perform unlimited pushing and pulling; occasionally kneel; and frequently climb, balance, stoop, crouch, crawl, and reach overhead. (AR 779-81.)

On April 15, 2008, chiropractor Philemon Tam examined Plaintiff and completed a comprehensive medical-legal evaluation. (AR 814-22.) Dr. Tam found that Plaintiff had tenderness in his thoracic, lumbar, and sacral spine and left knee and ankle; reduced ranges of motion of the lumbar spine, left ankle, and knees; and a slightly reduced range of motion of the left ankle. (AR 819, 821-22.) Plaintiff had normal reflexes, sensation, and motor strength. (AR 821.) Dr. Tam opined that Plaintiff was "unable to perform his usual customary job duties" because his low back, left knee, right shoulder, and left ankle had "progressively worsened." (AR 822.) Dr. Tam noted that Plaintiff had previously been able to lift 100 pounds but was now able to lift only 15 pounds and had therefore "lost 85% of his pre-injury capacity to lift." (Id.)

On July 15, 2008, Plaintiff sought medication refills at the Community Health Alliance of Pasadena ("CHAP") after losing his health insurance through Kaiser. (AR 855.) Physician Assistant Alejandra Astorga noted Plaintiff's past medical history, including his left-knee surgery, rib fractures, and "chronic low

1  back pain." (Id.)  PA Astorga diagnosed hypertension, depressive
2  disorder, insomnia, lumbago, knee pain, and alcohol abuse. (Id.)
3  On August 27, 2008, PA Astorga noted that Plaintiff's depression
4  had improved with medication but that he complained of anxiety
5  and right-upper-quandrant burning. (AR 853.)  On December 19,
6  2008, PA Astorga provided Plaintiff with the results of his lab
7  work and refilled his medications. (AR 851-52.)  On January 27,
8  2009, PA Astorga noted that Plaintiff complained of right-heel
9  pain, which Motrin helped, and had a history of a left broken
10 foot in October 1979. (AR 850.)  She found that Plaintiff's
11 hypertension was "not at goal" and his left foot had full range
12 of motion, no tenderness, and no swelling. (AR 850-51.)  She
13 prescribed Motrin for his right-heel pain. (AR 851.)

14      On March 27, 2009, PA Astorga noted that Plaintiff needed
15 medication refills and complained of gastrointestinal problems
16 but that his right heel pain was "resolved for now." (AR 848-
17 50.)  On June 18, 2009, PA Astorga noted that Plaintiff needed
18 medication refills and that his gastrointestinal symptoms had
19 resolved with medication. (AR 847.)  On July 30, 2009, Plaintiff
20 met with PA Astorga to follow up on his hypertension and undergo
21 a "routine" electrocardiogram ("EKG"). (AR 846.)  PA Astorga
22 noted that Plaintiff's EKG showed some abnormalities and
23 recommended that he undergo an echocardiogram. (AR 836, 846.)
24 On September 18, 2009, PA Astorga reviewed outside medical
25 records provided by Plaintiff, including his knee-operation and
26 MRI reports. (AR 845.)  On September 30 and November 19, 2009,
27 PA Astorga met with Plaintiff to follow up on his hypertension
28 and noted that he was noncompliant with his blood-pressure

20

medication because of gastrointestinal upset.  (AR 842, 844.)  On December 18, 2009, PA Astorga noted the results of Plaintiff's echocardiogram, which were within normal limits.  (AR 842, 836.) On January 19, 2010, PA Astorga noted that Plaintiff's blood pressure was not at goal; Plaintiff reported that he had not been walking and was under "a lot of stress." (AR 834.)  She advised Plaintiff to increase his medication but he "thoroughly decline[d]," citing gastrointestinal upset.  (AR 835.)  PA Astorga also requested a cardiology consult based on Plaintiff's abnormal EKG.  (AR 836.)  On March 2, April 12, and July 21, 2010, PA Astorga met with Plaintiff regarding his hypertension, impaired fasting glucose, high cholesterol, gastroesophageal reflux, and depression.  (AR 828-33.)

On September 28, 2010, Dr. Ruth Landsberger at CHAP noted that Plaintiff complained of rib-cage and low-back pain.[9]  (AR 826.)  Dr. Landsberger found that Plaintiff had generalized tenderness in his lower-lumbar area that was "not new or increased"; a negative straight-leg-raising test; and a normal ability to squat, heel walk, and toe walk.  (AR 827.)  She diagnosed lumbago and recommended that he use ibuprofen "sparingly" and "maintain as active a lifestyle as possible." (Id.)

**VI.  DISCUSSION**

Plaintiff alleges that the ALJ erred by (1) assessing an RFC that was unsupported by the record and (2) failing to properly

---

[9]   The ALJ mistakenly stated that Dr. Landsberger's note was dated September 2008.  (See AR 118.)

1  assess his credibility.[10]  (J. Stip. at 3.)

2         A.   <u>The ALJ Did Not Err in Determining Plaintiff's RFC</u>

3         Plaintiff contends that in determining his RFC, the ALJ

4  erred by adopting the opinions of examining physicians Alban and

5  Johnson and medical consultants Vaghaiwalla and Gilpeer because

6  they "did not review all relevant objective evidence in the

7  record nor consider all Plaintiff's impairments when providing

8  their functional assessments." (J. Stip. at 23-24.)  Plaintiff

9  argues that the ALJ should have instead relied on Dr. Tauber's

10  opinion that Plaintiff was totally disabled, or, alternatively,

11  Dr. Tam's opinion that Plaintiff could lift a maximum of 15

12  pounds.  (<u>Id.</u> at 24-26.)  Plaintiff also contends that the ALJ

13  erred by failing to consider "additional limitations caused by

14  [his] non-exertional impairment-pain [sic]." (<u>Id.</u> at 24.)

15  Remand is not warranted, however, because the ALJ properly

16  determined Plaintiff's RFC.

17              1.   <u>Applicable law</u>

18      A district court must uphold an ALJ's RFC assessment when

19  the ALJ has applied the proper legal standard and substantial

20  evidence in the record as a whole supports the decision.  <u>Bayliss</u>

21  <u>v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must

22  consider all the medical evidence in the record and "explain in

23  [his or her] decision the weight given to . . . [the] opinions

24  from treating sources, nontreating sources, and other

25  nonexamining sources."  §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

26

27        [10]   The Court addresses the issues raised in the Joint
   Stipulation in an order different from that used by the parties,
28  to avoid repetition and for other reasons.

22

In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints").  The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks and citation omitted).

             2.  Discussion

        The ALJ found that Plaintiff retained the RFC to perform a limited range of medium work; specifically, he could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and frequently reach "in all directions." (AR 119.)  In doing so, the ALJ accepted the opinions of the two examining physicians, Drs. Johnson and Alban, and the two nonexamining physicians, Drs. Vaghaiwalla and Gilpeer.  (AR 125.) The ALJ rejected the opinion of one of Plaintiff's treating physicians, Dr. Tauber, and the examining chiropractor, Dr. Tam. (AR 125-26.)

                  a.  The ALJ permissibly credited the opinions of
                      Drs. Johnson, Alban, Vaghaiwalla, and Gilpeer
        The ALJ was entitled to rely on the opinions of Drs. Johnson, Alban, Vaghaiwalla, and Gilpeer because all four were

consistent with an RFC for medium work with frequent reaching. (AR 125 (ALJ's decision noting that "with the exception of the opinion of Dr. Tauber," the "medical doctors appear to agree on [Plaintiff's] exertional [RFC]")); see §§ 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."), 416.927(c)(4) (same).  Dr. Johnson found that Plaintiff could push, pull, lift, and carry 50 pounds occasionally and 25 pounds frequently; stand and walk six hours in an eight-hour day; sit an unrestricted amount of time; and frequently reach in all directions, including overhead.  (AR 660.)  Dr. Alban found, in the context of Plaintiff's worker's compensation case, that Plaintiff's conditions precluded "heavy work," "very heavy lifting," and "prolonged activity or repetitive over-shoulder motion."  (AR 421-22.)  Based on the VE's testimony, the ALJ interpreted Dr. Alban's "heavy work" limitation to mean that Plaintiff had lost 50 percent of his preinjury capacity to lift and carry.  (AR 125; see also AR 84-85 (VE's testimony regarding meaning of worker's compensation terms)); see also State of Cal. Dep't of Indus. Relations, Division of Workers' Comp., Schedule for Rating Permanent Disabilities, 2-14 (Apr. 1997), available at https://www.dir.ca.gov/dwc/PDR1997.pdf (disability precluding heavy work contemplates that individual has lost approximately 50 percent of previous capacity).  Because Dr. Alban found that Plaintiff had been capable of lifting and carrying 100 pounds before his injuries (AR 403), the ALJ appropriately interpreted Dr. Alban's opinion as finding that Plaintiff could lift and

1   carry 50 pounds at a time (AR 125).[11]   See Booth v. Barnhart, 181

2   F. Supp. 2d 1099, 1106 (C.D. Cal. 2002) (when considering opinion

3   rendered in context of claimant's worker's compensation claim,

4   ALJ "must 'translate' terms of art contained in such medical

5   opinions into the corresponding Social Security terminology in

6   order to accurately assess the implications of those opinions for

7   the Social Security disability determination."). Drs.

8   Vaghaiwalla and Gilpeer also opined that Plaintiff could lift 50

9   pounds occasionally and 25 pounds frequently, stand and walk six

10  hours in an eight-hour day, and sit six hours in an eight-hour

11  day. (AR 668, 779.) And Dr. Vaghaiwalla found that Plaintiff

12  could frequently reach overhead and across the shoulder (AR 669),

13  while Dr. Gilpeer found that Plaintiff could frequently reach

14  overhead (AR 781). Moreover, the four doctors' findings were

15  consistent with those of treating physician Landsberger, who in

16  September 2010 noted that Plaintiff had a negative straight-leg-

17  raising test, no numbness or lower-extremity weakness, and a

18  normal ability to heel walk, toe walk, and squat. (See AR 827.)

19  As the ALJ found, therefore, the four medical opinions were

20  consistent with each other and an RFC for medium work.

21      The ALJ was also entitled to rely on Drs. Johnson's and

22  Alban's opinions because they were supported by independent

23  clinical findings and thus constituted substantial evidence upon

24  which the ALJ could properly rely. See Tonapetyan v. Halter, 242

25  F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d

26  1035, 1041 (9th Cir. 1995). Dr. Johnson performed a full

27  _____

28      [11]   Plaintiff does not challenge the ALJ's interpretation
     of Dr. Alban's opinion.

                              25

physical exam, noting, for example, that Plaintiff had a normal
gait; tenderness and decreased ranges of motion of the cervical
and thoracolumbrosacral spine and shoulders; and normal strength,
sensation, and reflexes. (AR 659-60.) Dr. Alban also performed
a full physical exam, noting, for example, that Plaintiff walked
with a limp; squatted slowly to 50 percent of normal; had
tenderness and reduced ranges of motion of the cervical and
lumbar spine and shoulders; and had normal strength, sensation,
and reflexes. (AR 411-19.) Dr. Alban also performed and
reviewed x-rays of Plaintiff's cervical spine, shoulders, hands,
chest, thoracolumbar spine, lumbar spine, knees, feet, and
ankles. (AR 419-20.) Drs. Vaghaiwalla's and Gilpeer's opinions,
moreover, relied on Dr. Johnson's findings and were consistent
with Drs. Johnson's and Alban's opinions. See Thomas v.
Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of
non-treating or non-examining physicians may also serve as
substantial evidence when the opinions are consistent with
independent clinical findings or other evidence in the record.").

    The ALJ was also entitled to credit the four doctors'
opinions because they all reviewed at least some of Plaintiff's
medical records before rendering their opinions: Dr. Alban
reviewed Plaintiff's full medical file, including Dr. Tauber's
reports and MRIs of Plaintiff's left knee, thoracic spine, lumbar
spine, right shoulder, and left shoulder (AR 406-11); Dr. Johnson
reviewed some of Plaintiff's treatment notes and the MRI of his
cervical spine (AR 657-58); Dr. Vaghaiwalla reviewed Dr.
Johnson's report (AR 671); and Dr. Gilpeer reviewed Dr. Johnson's
report and Dr. Tauber's January 2007 progress note (AR 779-80).

See §§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources"), 416.927(c)(3) (same). Thus, any conflict in the properly supported medical-opinion evidence was "solely the province of the ALJ to resolve." Andrews, 53 F.3d at 1041.

Plaintiff nevertheless contends that the ALJ erred by adopting the opinions of the four physicians because they "did not review all relevant objective evidence in the record nor consider all Plaintiff's impairments when providing their functional assessments." (J. Stip. at 23-24.) First, Plaintiff argues that Dr. Alban "specifically stated that he did not consider Plaintiff's neck impairment in his overall functional assessment" and therefore "his assessment was made without consideration of an additional documented orthopedic impairment that would reasonably result in additional limitations." (J. Stip. at 26.) But the record clearly shows that Dr. Alban fully assessed and considered Plaintiff's cervical-spine condition: he performed a physical examination of Plaintiff's cervical spine, noting tenderness and reduced range of motion (AR 412-13); reviewed x-rays of Plaintiff's cervical spine and found that they showed flattening of the normal cervical lordotic curve, "slight" impingement at C5-6, narrowing of the intervertebral foramen, and no significant disc space narrowing (AR 419); and diagnosed "[c]ervical degenerative changes, minimal" (AR 420). Dr. Alban concluded, however, that Plaintiff's cervical-spine condition was "not a factor" in his "ability to work" because Plaintiff had "no

27

specific complaints" about it and "the only disability is limited range of motion" (AR 422).   Contrary to Plaintiff's contention, therefore, Dr. Alban specifically considered Plaintiff's cervical-spine condition, including any neck impairment.   Dr. Alban, however, simply found that it did not affect Plaintiff's ability to work.

Second, Plaintiff contends that the ALJ erred by relying on Dr. Johnson's opinion because he "did not review MRIs of Plaintiff's shoulders showing bilateral tears." (J. Stip. at 26.)   But although Dr. Johnson apparently did not review Plaintiff's shoulder MRIs, he did review and summarize two of Dr. Tauber's treatment notes, which reflected Plaintiff's complaints of shoulder pain and Dr. Tauber's finding that Plaintiff was a candidate for shoulder surgery.   (AR 657-58 (discussing Dr. Tauber's April 5, 2006 and May 11, 2006 notes); see also AR 429 (Dr. Tauber's April 5, 2006 note), 443 (Dr. Tauber's May 11, 2006 note).)   Dr. Johnson also examined Plaintiff's shoulders, noting that Plaintiff had "slight tenderness" in the right shoulder and reduced abduction in both shoulders but "otherwise full range of motion." (AR 659.)   Moreover, as previously discussed, Dr. Johnson's findings were consistent with those of Dr. Alban, who did review the shoulder MRIs before rendering his opinion.   (See AR 409.)   Thus, the fact that Dr. Johnson did not review Plaintiff's shoulder-MRI reports before rendering his decision does not establish that the ALJ's reliance on his opinion was misplaced.

Finally, Plaintiff contends that the ALJ erred by relying on the opinions of Drs. Vaghaiwalla and Gilpeer because they did not

28

"review[] MRIs of the cervical spine, lumbar spine, right knee, bilateral shoulders and left foot" before rendering their opinions. (J. Stip. at 26.) As discussed above, however, those opinions were consistent with the opinion of Dr. Alban, who reviewed Plaintiff's full medical file, including his MRIs. (See AR 406-11.) Plaintiff, moreover, does not cite any particular finding in the MRI reports that conflicts with Drs. Vaghaiwalla's and Gilpeer's opinions. The ALJ therefore did not err by relying on the opinions of Drs. Vaghaiwalla and Gilpeer.

> b.   The ALJ gave legally sufficient reasons for
>      rejecting the opinions of Drs. Tauber and Tam

The ALJ gave specific and legitimate reasons for rejecting Dr. Tauber's controverted opinion that Plaintiff was totally disabled. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (when treating physician's opinion conflicts with another doctor's, ALJ must provide "specific and legitimate reasons" for discounting treating doctor's opinion). First, the ALJ correctly concluded that he need not accept Dr. Tauber's bare assertion that Plaintiff was totally disabled because the determination of a claimant's ultimate disability is reserved to the Commissioner. (AR 125); see §§ 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), 416.927(d)(1) (same); SSR 96-5p, 1996 WL 374183, at *5 (treating-source opinions that a person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (as amended) ("A disability is an

29

administrative determination of how an impairment, in relation to
education, age, technological, economic, and social factors,
affects ability to engage in gainful activity."). Indeed, as the
ALJ found, Dr. Tauber "granted periods of only very temporary
disability" or stated only that Plaintiff was "totally disabled";
he "did not describe the activities that [Plaintiff] remained
able to perform." (AR 125; see also AR 355, 363, 376, 378, 383,
390, 395, 430, 443, 574, 654, 707, 722, 729, 744, 753, 747, 749.)
The ALJ therefore was not obligated to accept Dr. Tauber's
conclusory opinion that Plaintiff was totally disabled.

The ALJ was also entitled to reject Dr. Tauber's opinions
because his progress notes failed to support or explain his
opinion that Plaintiff was totally disabled. (AR 125-26.) In
his initial physical-examination report, Dr. Tauber noted only
that Plaintiff walked with a limp; "lack[ed] inversion/eversion
at the left subtalar joint"; and had lumbar pain when bending
forward to touch his calves, pain on motion of both shoulders
with positive impingement signs, and tenderness and crepitation
of the left knee. (AR 354-55.) In his subsequent progress
notes, moreover, Dr. Tauber recorded minimal examination
findings, often stating only that Plaintiff's physical
examination was "unchanged" (AR 390, 394, 443, 574, 654, 686,
747) or briefly noting that he had "tenderness" or "pain" (see AR
362 (knee tenderness); 383 (pain on lumbar motion); AR 429 (pain
on motion); AR 651 (pain on shoulder motion); AR 684 (pain on
shoulder motion, knee tenderness, pain throughout spine); AR 707
(tenderness at knee, shoulder, and back)). Such minimal
examination findings fail to support Dr. Tauber's ongoing opinion

that Plaintiff was completely incapable of working.  <u>See</u> <u>Connett</u>
<u>v. Barnhart</u>, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's
opinion properly rejected when treatment notes "provide no basis
for the functional restrictions he opined should be imposed on
[claimant]"); <u>Valentine v. Comm'r, Soc. Sec. Admin.</u>, 574 F.3d
685, 692-93 (9th Cir. 2009) (contradiction between treating
physician's opinion and his treatment notes constitutes specific
and legitimate reason for rejecting treating physician's
opinion); <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190,
1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians'
opinions that are conclusory, brief, and unsupported by the
record as a whole . . . or by objective medical findings");
<u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ
permissibly rejected treating physician's opinion when opinion
was contradicted by or inconsistent with treatment reports).

     Plaintiff erroneously contends that Dr. Tauber's opinion
should have been given more weight because the "objective
evidence of record" supported it. (J. Stip. at 24.)  As
discussed above, however, Dr. Tauber's opinion consisted solely
of a conclusion that Plaintiff was unable to work, which
Plaintiff concedes is not binding on the ALJ (<u>id.</u>), and it
conflicted with the opinions of the other four physicians who
rendered opinions regarding Plaintiff's remaining capabilities.
As discussed, the ALJ was entitled to credit those opinions
instead of Dr. Tauber's because they were supported by
independent evidence and more consistent with the record as a
whole, among other things.  <u>See</u> <u>Thomas</u>, 278 F.3d at 957;
<u>Tonapetyan</u>, 242 F.3d at 1149; §§ 404.1527(c)(4), 416.927(c)(4).

Dr. Tauber's opinion that Plaintiff was totally disabled also conflicted with the mild findings of treating physician Landsberger, who had examined Plaintiff most recently and noted that he had "generalized spinal tenderness" but no numbness or weakness and a normal ability to squat, heel walk, and toe walk. (AR 827; <u>see also</u> AR 118 (discussing Dr. Landsberger's findings), 122 (same).)

Finally, the ALJ also properly rejected the opinion of Dr. Tam. Dr. Tam, as a chiropractor, is not considered an "acceptable medical source" under the agency's regulations. <u>See</u> §§ 404.1513(a) ("[a]cceptable medical sources" include only licensed physicians, psychologists, optometrists, podiatrists, and speech pathologists), 416.913(a) (same). Rather, the regulations treat chiropractors as "other sources," <u>see</u> §§ 404.1513(d), 416.913(d), and the ALJ may reject opinions from "other sources" by giving "reasons germane to each witness for doing so," <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation and internal quotation marks omitted); <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1224 (9th Cir. 2010) (citation and internal quotation marks omitted).

Here, the ALJ gave germane reasons for rejecting Dr. Tam's opinion. First, Dr. Tam's finding that Plaintiff was limited to lifting only 15 pounds and had lost 85 percent of his preinjury capacity was inconsistent with the opinions of orthopedic surgeons Johnson and Alban and medical doctors Vaghaiwalla and Gilpeer, who all found that Plaintiff could perform a limited range of medium work. The ALJ therefore permissibly accorded more weight to the opinions of the medical doctors, who had

32

"greater expertise in musculoskeletal conditions." (AR 126); <u>see</u> <u>Molina</u>, 674 F.3d at 1112 (conflict with medical source's opinion was germane reason for discounting opinion of other source); <u>Hubble v. Astrue</u>, 467 F. App'x 675, 676-77 (9th Cir. 2012) (ALJ entitled to give greater weight to "acceptable medical sources" than to chiropractor); SSR 06-3p, 2006 WL 2329939, at *5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' are the most qualified health care professionals." (some internal quotation marks omitted)). Moreover, Dr. Tam's finding that Plaintiff could lift only 15 pounds was not supported by his mild clinical findings when examining Plaintiff's shoulders: Dr. Tam found that Plaintiff had only "slight pain" on abduction of the right shoulder and reduced range of motion of the right shoulder as compared to the left; he also found that Plaintiff nevertheless had normal reflexes and sensation and "strong and equal" motor strength. (AR 882-85.) That was another germane reason for rejecting Dr. Tam's opinion. (AR 126 (finding "nothing in the clinical findings" to support Dr. Tam's opinion)); <u>see</u> <u>Batson</u>, 359 F.3d at 1195 (ALJ may discredit opinion that is "conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings").

The ALJ therefore did not err in rejecting Dr. Tam's opinion in favor of the opinions of Drs. Johnson, Alban, Vaghaiwalla, and Gilpeer.

c.   The ALJ did not err by failing to consider
any nonexertional limitations resulting from
Plaintiff's pain

Plaintiff contends that the ALJ committed "legal error" by
failing to include "limitations resulting from pain in
[Plaintiff's] RFC assessment." (J. Stip. at 28.)  Plaintiff
asserts that he "testified to having chronic pain, the medical
record documented persistent complaints of pain, and objective
evidence revealed pathology in the neck, back, shoulders, knee,
and foot that would reasonably result in pain." (Id. (citations
omitted).)  As discussed below in Part VI.B, however, the ALJ
permissibly discredited Plaintiff's subjective symptom testimony
to the extent it was inconsistent with an RFC for a limited range
of medium work.  The ALJ therefore was not required to include in
the RFC any limitations based on those properly discredited
complaints.  See Bayliss, 427 F.3d at 1217.

In sum, the ALJ's RFC determination was supported by
substantial evidence.  Plaintiff is not entitled to remand on
this ground.

B.   The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ's credibility determination is
not supported by substantial evidence and must be reversed.  (J.
Stip. at 3.)

1.   Applicable law

An ALJ's assessment of pain severity and claimant
credibility is entitled to "great weight." See Weetman v.
Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to

34

believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina, 674 F.3d at 1112 (internal quotation marks and citation omitted).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Thus, an ALJ can reject the claimant's subjective symptom testimony only upon "(1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); see also Lester, 81 F.3d at 834 (absent affirmative evidence of malingering, ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony).  Evidence of malingering is alone a sufficient basis for the ALJ to find a claimant not credible.  See Bagoyan Sulakhyan v. Astrue, 456 F. App'x 679, 682 (9th Cir. 2011) ("When there is affirmative evidence of malingering, which is present in

35

this case, the ALJ is relieved of the burden of providing specific, clear, and convincing reasons to discount claimant's testimony."); Schow v. Astrue, 272 F. App'x 647, 651 (9th Cir. 2008) ("the weight of our cases hold that the mere existence of 'affirmative evidence suggesting' malingering vitiates the clear and convincing standard of review").

If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

2.   Relevant facts

In an undated disability report, Plaintiff wrote that his shoulder, low-back, and left-ankle pain prevented him from working. (AR 265.) He said that he was in "constant pain" from his low back, could not walk for a long time because of his "swelling ankle," and could not sit or stand for "a long period of time" because of shoulder and low-back pain. (Id.)

In a pain questionnaire dated July 10, 2006, Plaintiff wrote that he had pain every day in his buttocks, left hip and knee, neck, low back, left ankle, and right shoulder. (AR 271.) Plaintiff was able to run errands, such as going to the post office and grocery store, and perform "light housekeeping chores," such as dusting and cooking. (AR 273.) Plaintiff said that he could walk one-half mile outside his home, stand one hour at a time, and sit 30 minutes at a time. (Id.)

In an undated "disability report – appeal," Plaintiff wrote that his conditions had not changed since his last disability report but that he was "experiencing feelings of anxiety, nervousness and depression." (AR 286.) Plaintiff said that he

36

could "generally care for [his] personal needs" but "still experience[d] some pain in [his] back when bending over to tie [his] shoes." (AR 289.) Plaintiff wrote that his "lower back and butt" hurt when he drove "long distances" and that his daughter would help when he had to buy heavier items at the store. (<u>Id.</u>) In another undated "disability report – appeal," Plaintiff wrote that he was "having more trouble sleeping because the pain [woke him] up at night" and that his hands would "cramp up" and he had trouble moving and opening them. (AR 297.)

At the hearing on May 12, 2008, Plaintiff testified that he stopped working because he broke two ribs and injured his back in June 2004, and because in May 2005 he became "paralyzed" on the left side for a week "[f]rom the same pain [he had] before." (AR 24, 27-28.) Plaintiff said that his September 2005 left-knee surgery improved his pain by 70 percent, but he "still [had] some pain when [he was] walking." (AR 37.) Plaintiff said he had problems using a computer mouse for more than 20 minutes because of his shoulder problems and that the movement of his arms while walking make his shoulders sore. (AR 30-31.) When the ALJ questioned Plaintiff about Dr. Alban's finding of inconsistent and partial effort during range-of-motion measurements, Plaintiff said that he had had a "pinched nerve" in his neck and was "maybe" in pain at the time. (AR 45.) Plaintiff testified that he had stopped seeing his doctor at Kaiser Permanente because he no longer had medical insurance, and he also could not afford to go to the chiropractor every week. (AR 32, 36.) Plaintiff took medication to help him sleep but was not receiving treatment for his depression and anxiety. (AR 42-43.)

Plaintiff testified that he could lift 15 or 20 pounds one or two times, walk 20 minutes, stand 30 minutes, and sit 30 minutes at a time.  (AR 31, 34, 39.)  His activities included cleaning his backyard, cooking dinner for his wife, walking about 20 minutes a day, and driving about 30 minutes at a time.  (AR 46.)  Plaintiff said he could take care of his personal needs but sometimes had trouble washing his back or tying his shoes.  (AR 47.)

At the hearing on January 6, 2011, Plaintiff testified that he cleaned his yard once a week for 40 to 45 minutes, walked about 20 minutes a day, cooked, cleaned the house about 30 minutes a day by putting things away and washing dishes, drove his wife to the train station when she went to work, and occasionally did small jobs for people, such as fixing a faucet. (AR 64, 69, 76-77.)  Plaintiff said he used to drive but now got irritated with traffic and would drive only 10 to 15 minutes at a time.  (AR 70.)

Plaintiff acknowledged that he had been going to the CHAP clinic for over two years and that doctors there had prescribed Motrin or Tylenol for his back pain.  (AR 66-67.)  Plaintiff testified that his pain prevented him from sleeping.  (AR 75.) He said that his knee pain was about 60 percent better since his surgery.  (AR 79.)  Plaintiff testified that he could lift 15 or 20 pounds "two or three times" but "not for an hour," walk 20 minutes at a time, and stand an hour a day.  (AR 76.)

### 3.   Discussion

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged

symptoms but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they would reduce his [RFC] below that specified" by the ALJ.  (AR 121.)  The ALJ also found that Plaintiff "may tend to exaggerate his limitations."  (AR 124.) Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's subjective symptoms.

The ALJ permissibly discounted Plaintiff's credibility based on evidence of malingering.  (Id.)  As the ALJ noted (id.), Dr. Alban found that Plaintiff gave only "inconsistent and partial effort" during range-of-motion testing of his cervical and lumbar spine (AR 412, 415), indicating malingering.  At the hearing, Plaintiff said that any perceived lack of effort may have been a result of pain caused by a "pinched nerve" in his neck (AR 45), but the ALJ reasonably rejected that explanation (AR 124) because it conflicted with Dr. Alban's explicit observation that Plaintiff had "no reported pain" while he assessed cervical and lumbar ranges of motion "during the motion phase or at end range" (AR 413, 416; see also AR 422 (noting that Plaintiff had "no specific complaints of the cervical spine at this time")). Moreover, even assuming that the "pinched nerve" in Plaintiff's neck affected his performance during testing of his cervical spine, that still would fail to explain Plaintiff's lack of effort during testing of his lumbar spine.  Because that evidence constitutes affirmative evidence of malingering, the ALJ was entitled to reject Plaintiff's testimony on this basis alone. See Benton, 331 F.3d at 1040; Flores v. Comm'r of Soc. Sec., 237

1  F. App'x 251, 252-53 (9th Cir. 2007) ("an ALJ may reject a
2  claimant's subjective pain testimony if the record contains
3  affirmative evidence of malingering").  The ALJ nevertheless
4  provided other clear and convincing reasons for discounting
5  Plaintiff's credibility.

6        The ALJ was also permitted to discount Plaintiff's testimony
7  based on his "tend[ency] to exaggerate."  (AR 124); <u>Tonapetyan</u>,
8  242 F.3d at 1148 (credibility determination based on, among other
9  things, plaintiff's "tendency to exaggerate" proper when
10 supported by "substantial evidence").  The ALJ noted (AR 114)
11 that Plaintiff had testified that he stopped working in May 2005
12 because he was "paralyzed" for one week, which was not
13 precipitated by any new injury but was "[f]rom the same pain [he
14 had] before" (AR 27-28).  But although Plaintiff testified that
15 he had been "paralyzed" until he saw Dr. Norton (AR 28), Dr.
16 Norton noted that Plaintiff complained only of persistent
17 thoracic and left-hip pain and that he had been working, albeit
18 with some difficulty; nowhere does he mention that Plaintiff was
19 "paralyzed" (AR 353).  Moreover, Plaintiff later testified that
20 Dr. Alban correctly noted that Plaintiff had stopped working in
21 May 2005 because he had twisted his back on an extension ladder,
22 causing radiating low-back pain, not that he had been "paralyzed"
23 with no precipitating injury.  (AR 43-44; <u>see also</u> AR 401.)
24 Substantial evidence therefore supports the ALJ's finding that
25 Plaintiff tended to exaggerate his subjective symptoms and
26 limitations.

27       The ALJ was also entitled to discount Plaintiff's
28 credibility because his claims of disability conflicted with his

reported daily activities.  <u>See</u> <u>Smolen</u>, 80 F.3d at 1284 (ALJ may use "ordinary techniques of credibility evaluation," such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"); <u>Thomas</u>, 278 F.3d at 958-59 (in assessing credibility, ALJ may consider inconsistencies either in claimant's testimony or between testimony and conduct); <u>cf.</u> <u>Molina</u>, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  Plaintiff asserted that he was able to run such errands as shopping for groceries and going to the post office, clean the house for about 30 minutes a day, clean his backyard once a week for about 45 minutes, cook dinner for his wife, go for 20-minute walks, drive his wife to the train station, and occasionally perform small odd jobs for people.  (AR 46, 64, 69, 76-77, 273.)  Those activities appear inconsistent with Plaintiff's assertion that he was totally disabled and capable of, for example, walking only 20 minutes, standing only 30 minutes or an hour, and sitting only 30 minutes.  (AR 34, 39, 76.)

The ALJ also reasonably discounted Plaintiff's credibility based on his failure to seek treatment for his allegedly debilitating conditions.  <u>See</u> <u>Molina</u>, 674 F.3d at 1112 (in determining credibility, ALJ may consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" (citation and internal quotation marks omitted)); <u>Orn v. Astrue</u>, 495 F.3d 625, 638 (9th Cir. 2007)

("[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated."). In October 2005, Dr. Rosenberg at Kaiser Permanente noted that Plaintiff was able to work despite his left-heel pain and advised that if work became "bothersome," Plaintiff could return for consideration of subtalar-fusion surgery. (AR 561.) As the ALJ noted, however, "no evidence" showed that Plaintiff ever pursued surgery, which tended to show that Plaintiff's "old injury d[id] not prevent him from working." (AR 121.) Moreover, between July 2008 and September 2010, Plaintiff was treated at CHAP for a variety of medical conditions but never sought treatment for left-heel pain (see AR 826-55); in fact, in March 2009, PA Astorga noted that Plaintiff's left foot had full range of motion, with no tenderness or swelling (AR 850), and in September 2010, Dr. Landsberger found that Plaintiff had a normal ability to heel and toe walk (AR 826-27). Plaintiff, moreover, sought treatment for his right-heel pain only once, in January 2009. (AR 850-51.) Plaintiff was prescribed Motrin, and by his next visit, in March 2009, his right-heel pain was "resolved for now." (Id.)

The ALJ also noted that Plaintiff's "lack of ongoing specific complaints regarding the low back pain" suggested that his back impairment was "hardly debilitating." (AR 122.) Indeed, during the two years that Plaintiff was treated at CHAP, he sought treatment for low-back pain only once, in September 2010. (AR 826-27.) At that time, Dr. Landsberger found that Plaintiff had generalized tenderness in his lower-lumbar area

that was "not new or increased"; she recommended that he use
ibuprofen "sparingly" and "maintain as active a lifestyle as
possible." (Id.) Plaintiff, moreover, never sought treatment at
CHAP for his neck or knee pain (see AR 850-51), and as the ALJ
noted, no doctor ever recommended neck or back surgery and "no
doctor at CHAP[] [] referred [Plaintiff] to an orthopedic
specialist." (AR 124.) The ALJ also noted that Plaintiff had
received a worker's compensation settlement and therefore would
have been able to pay for additional medical treatment.[12] (AR
121.)

Plaintiff argues that the ALJ should not have relied on
Plaintiff's failure to seek treatment at CHAP for his back pain
because "notations of back pain and lumbago were reported as
chronic conditions in CHAP[] records" and "[c]hronic means
ongoing." (J. Stip. at 7-8 (emphasis in original).) But the
repeated notations of back pain appear in Plaintiff's lists of
diagnoses, not as part of any specific complaint raised during
the appointment, and they simply repeat verbatim the identical
information: that Plaintiff had chronic back and neck pain, his
previous reports had been scanned, and he was pursuing worker's
compensation and Social Security benefits. (See AR 824-25
(noting "lumbago, neck pain, chronic" and "pts CT scan of C
spine, R shoulder, and L spine scanned, workers comp injury, pt
has case open with lawyer and via SS admin"); accord AR 829, 831,

___

[12]    Plaintiff testified that he received $72,000 as a
result of the settlement of his worker's compensation case (AR
33); the order approving the settlement shows that the parties
settled the case for $110,000 less certain funds, resulting in a
balance to be paid of $74,014.29 (AR 869-77).

1   833, 835, 837, 843, 844, 846, 848, 849-50, 851.)   Thus, the ALJ
2   reasonably noted that "low back pain [was] listed as a chronic
3   condition" in the CHAP records but concluded that the condition
4   could not have been "debilitating" given Plaintiff's lack of any
5   specific complaints about it.   (AR 122.)

6       Plaintiff also contends that the ALJ improperly discounted
7   his credibility based on Dr. Kung's finding that he was "cured"
8   because he made that finding a few months before Plaintiff's
9   alleged onset date, May 7, 2005.   (J. Stip. at 5.)   Plaintiff's
10  argument fails, however, because nothing indicates that the ALJ
11  relied on Dr. Kung's note in discounting Plaintiff's credibility.
12  Rather, the ALJ merely summarized Dr. Kung's findings in two
13  sentences, correctly noting that he found that Plaintiff
14  "returned to full duty on December 10, 2004, with only occasional
15  pain, good strength, and no neurological deficits" and therefore
16  discharged him as "cured."   (AR 121; see also AR 512.)

17      One of the ALJ's credibility findings, however, may not be
18  clear and convincing.   Two doctors noted that Plaintiff was a
19  candidate for shoulder surgery (see, e.g., AR 422, 429-30, 651,
20  686), and the ALJ concluded that because Plaintiff "has not
21  pursued surgical treatment of his right shoulder," he must
22  consider his "shoulder pain to be adequately controlled" (AR
23  124).   But Plaintiff testified at the hearing that his daughter
24  had undergone shoulder surgery for a torn tendon and "it didn't
25  turn out good," so Plaintiff was "afraid" of having shoulder
26  surgery himself.   (AR 76-77.)   Plaintiff's apprehension may
27  constitute a good reason for forgoing surgery.   See Orn, 495 F.3d
28  at 638 (noting that failure to seek treatment may be basis for an

adverse credibility finding "unless one of a number of good reasons for not doing so applies" (citation and internal quotation marks omitted)).   Any error, however, is harmless because the ALJ's credibility finding was supported by other clear and convincing reasons.   See <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1227 (9th Cir. 2009); <u>Carmickle</u>, 533 F.3d at 1162.

Plaintiff is not entitled to remand on this ground.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 23, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[13]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."